```
 1                  UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2
     ----------------------------------------------------------
 3                                    )
     United States of America,        )   File No. 16CR334
 4                                     )   (JNE/KMM)(2)
                Plaintiff,             )
 5                                     )
     vs.                               )   Minneapolis, Minnesota
 6                                     )   March 6, 2017
     John L. Steele,                   )   Courtroom 12W
 7                                     )   9:37 a.m.
                Defendant.             )
 8                                     )
     ----------------------------------------------------------
 9
                 BEFORE THE HONORABLE JOAN N. ERICKSEN
10                UNITED STATES DISTRICT COURT JUDGE
                            (CHANGE OF PLEA)
11
     APPEARANCES
12     For the Plaintiff:        Assistant U.S. Attorney
                                 BENJAMIN F. LANGNER, AUSA
13                               DAVID J. MACLAUGHLIN, AUSA
                                 300 South Fourth Street
14                               Suite 600
                                 Minneapolis, Minnesota 55415
15

16     For the Defendant:        Wold Morrison Law
                                 PETER B. WOLD, ESQ.
17                               247 Third Avenue South
                                 Minneapolis, MN 55415-1003
18
                                 Law Offices of Mark Eiglarsh
19                               MARK EIGLARSH, ESQ.
                                 4770 Biscayne Boulevard
20                               Suite 610
                                 Miami, FL  33137
21
       Court Reporter:          MARIA V. WEINBECK, RMR-FCRR
22                              1005 U.S. Courthouse
                                300 South Fourth Street
23                              Minneapolis, Minnesota 55415

24
                    Proceedings recorded by mechanical
25      stenography; transcript produced by computer.
```

Case 1:13-cv-01560 Document #: 13-1 Filed: 11/13/18 Page 2 of 32 PageID #:2167

2

```
 1              P R O C E E D I N G S

 2                   IN OPEN COURT

 3              THE COURT:  Good morning.  Please be seated.

 4    Could we have appearances for the record, please?  We'll

 5    start with the government.

 6              MR. LANGNER:  Good morning, Your Honor.  Ben

 7    Langner, Brian Levine and David MacLaughlin on behalf of the

 8    United States.

 9              MR. MACLAUGHLIN:  Good morning, Your Honor.

10              THE COURT:  Good morning.

11              MR. LEVINE:  Good morning, Your Honor.

12              MR. EIGLARSH:  Good morning, Your Honor.

13              THE COURT:  Just a second, I'm not quite ready for

14    you.  Mr. Langner, I understand Mr. Levine is not yet

15    admitted.

16              MR. LANGNER:  That's correct, Your Honor.  We're

17    working on getting him admitted at this time.

18              THE COURT:  So my question is is he with the

19    California Highway Patrol?  Because it says here he's with

20    CHIPS.

21              (Laughter.)

22              MR. LANGNER:  He's with DOJ CCIPs, the Computer

23    Crime and Intellectual Property Section, which is I think

24    slightly different.

25              THE COURT:  Oh, ha ha.  All right.  Now, whoever
```

```
 1    you are, go ahead and introduce yourself.

 2              MR. EIGLARSH:  Good morning, Your Honor.  Mark

 3    Eiglarsh on behalf of Mr. Steele, who is present in court.

 4              THE COURT:  E-I-G-L-A-R-S-H, is that right?

 5              MR. EIGLARSH:  Yes.

 6              THE COURT:  Mr. Steele, I presume?

 7              THE DEFENDANT:  Yes, Your Honor.

 8              THE COURT:  And who are you, stranger?

 9              MR.  WOLD:  Good morning, Your Honor.  Peter Wold

10    appearing as local counsel for Mr. Steele and Mr. Eiglarsh.

11              THE COURT:  Okay.  And, Mr. Eiglarsh, you are

12    from -- are you admitted to Minnesota?

13              MR. EIGLARSH:  I am not, Your Honor.

14              THE COURT:  Okay.  What state are you?

15              MR. EIGLARSH:  Florida.

16              THE COURT:  Okay.

17              MR. EIGLARSH:  From South Florida.

18              THE COURT:  Do you have a -- well, anyway, that's

19    fine.  Welcome.

20              MR. EIGLARSH:  Thank you, Your Honor.

21              THE COURT:  I understand and, Mr. Steele, you can

22    go ahead and be seated for the moment, but you'll probably

23    have to stand up in just a second.

24              I understand, Mr. Eiglarsh, that Mr. Steele is

25    going to be entering a change of plea this morning, is that
```

Case 1:13-cv-01569 Document #: 13B-1 Filed: 11/13/18 Page 4 of 32 PageID #:2169

4

```
 1    true?

 2              MR. EIGLARSH:  That's correct, Your Honor.

 3              THE COURT:  All right.  Mr. Steele, come on up to

 4    the podium with your lawyer.  And, Mr. Langner, you're

 5    obviously welcome to join the party.

 6              Mr. Steele, let me explain how the process works.

 7    I have a plea agreement here.  And so the first thing I want

 8    to do is make sure that the document that I have is the same

 9    document that you have reviewed, that you understand

10    everything that's in it, and that it in fact represents the

11    agreement that you and the government have made with respect

12    to resolving the issues and resolving the case against you.

13              I need to get some background information

14    sufficient to be satisfied that you're able to make a

15    knowing and intelligent and voluntary plea.  And the reason

16    for that is that the change of plea is a very important and

17    irrevocable decision, so at any point during the hearing if

18    you change your mind, that's perfectly fine, but if we get

19    to the end and you change your plea from not guilty to

20    guilty, you can't ever come back and withdraw that or change

21    your mind.  So it's important that any questions that you

22    have we get resolved, and that you don't plead guilty unless

23    you want to, so that's part of the reason we do that.

24              I also will make sure that you understand the

25    rights that you give up by pleading guilty, not because I am
```

1   not confident that your lawyers have already explained them

2   and that you understand them from your own background, but I

3   want to give you another chance to hear them from me, think

4   about them here in court, and, again, ask any questions that

5   you might have.

6            THE DEFENDANT:  Thank you, Your Honor.

7            THE COURT:  I also need to know what you did that

8   makes you guilty of the offense because I don't take a

9   guilty plea from someone who is not actually guilty.  Your

10  answers have to be under oath.  That means that if you make

11  a false statement, you could be prosecuted for perjury or

12  false statement.  Do you understand that?

13           THE DEFENDANT:  Yes, Your Honor.

14           THE COURT:  Okay.  Raise your right hand, please.

15           (Defendant sworn.)

16  BY THE COURT:

17  Q.  Now, do you have the plea agreement in front of you,

18  Mr. Steele?

19  A.  I do.

20  Q.  And have you and Mr. Eiglarsh gone through that in great

21  detail?

22  A.  Yes, Your Honor.

23  Q.  And have there, Mr. Langner, been any changes since the

24  plea agreement was sent up to chambers?

25           MR. LANGNER:  No, Your Honor.

1    BY THE COURT:

2    Q.  Okay.  It's a 26-page document.  And let me ask if

3    you've gone through every line and every page with your

4    lawyer?

5    A.  Yes, Your Honor.

6    Q.  And you understand that it contemplates a plea to

7    Count 1 of the indictment, which is a charge of conspiracy

8    to commit mail fraud and wire fraud, in violation of federal

9    law; and also Count 17, which charges conspiracy to commit

10   money laundering, again, in violation of federal law.

11          And then if at the time of sentencing you have

12   complied with these terms, then the government will move to

13   dismiss any remaining counts.

14   A.  Yes, Your Honor.

15   Q.  And the way it works is if they move to dismiss those

16   counts, that motion will be granted.

17   A.  Yes, Your Honor.

18   Q.  All right.  Now, there are penalties set forth in

19   federal law, and they are also in the plea agreement.

20   Seventeen pages of facts here.  All right.  That first count

21   that we talked about is punishable by up to 20 years in

22   prison.  Do you understand that?

23   A.  Yes, Your Honor.

24   Q.  And also a criminal fine that could be $250,000 or twice

25   the gross gain or loss, whichever is the larger number; do

1    you understand?

2    A.  Yes, Your Honor.

3    Q.  And then it carries a supervised release of up to five

4    years.  Supervised release is a period of time during which

5    a person is under court-ordered supervision.  And if they

6    violate any terms of supervised release, they can be sent

7    back to prison for an additional period of time.  And this

8    is a little different from what the systems are in those

9    states.

10          And in particular, let's say that a person commits

11   a crime that has a five year statutory maximum.  I know

12   your's is 20, but we're just having a hypothetical person.

13   So the person gets the full five years in prison.  They

14   serve their five years.  They get out.  They're on

15   supervised release for four years.  They're perfectly fine

16   on supervised release for three and a half years and then

17   they violate.  Well, you would think they can only be facing

18   half a year, but the way it works they could get a full four

19   years in prison even though they've already done five.

20   Anyway I'm sure your lawyer explained that to you, but --

21   A.  Yes, Your Honor.

22   Q.  I find it comes as a surprise to anybody who comes from

23   the state court system.  Anyway, every felony count of

24   conviction carries a $100 special assessment, and Count 1

25   also carries the possibility that you would be charged the

1      costs of prosecution.

2              And then Count 17 also has a maximum term of

3      imprisonment of 20 years.  It has a criminal fine of up to

4      $500,000 or twice the gross gain or loss, whichever is

5      greater.  It also carries a supervised release term of up to

6      five years, and a special assessment of $100, which is due

7      and payable to the Clerk of Court prior to sentencing.

8      Those hundred dollar payments go to the Crime Victims Fund

9      and also the costs of prosecution.  Any questions about

10     that?

11     A.  No, Your Honor.

12     Q.  Separate from the statutory penalties, there are

13     sentencing guidelines.  The sentencing guidelines are one of

14     the factors that the Court takes into consideration in

15     determining what your actual sentence will be.  There is a

16     guideline manual, and there are a lot of factors that go

17     into determining what the range is.  And perhaps you and

18     your lawyer have looked at that chart, and sometimes it's on

19     the back cover of the book, and sometimes they look at --

20     you might look at one in a different form.  But you know

21     there's a vertical axis and a horizontal axis, the

22     horizontal has to do with criminal history.  The vertical is

23     the offense conduct, and there are a lot of things that go

24     into that.

25              And the plea agreement here contains some

1    agreements and stipulations as between you and the

2    government about what the guidelines are likely to be.  But

3    what I want to emphasize is that the Court is not bound by

4    parties' predictions or arguments about what the guidelines

5    are.  You can bind yourselves about what arguments you're

6    going to make, but the Court is not a signatory to the plea

7    agreement and is bound by law to make an accurate

8    determination to sentencing guidelines.  And then once that

9    guideline range is located, then it's up to the Court to

10   sentence you within the guideline range or above it or below

11   it.

12   A.  I understand, Your Honor.

13   Q.  All right.  And you've gone through all of this.  Let me

14   just think of an easy way to summarize it.  We've got an

15   agreement as between you that the loss amount is between

16   $1,500,000 and $3,500,000.  So that's a base offense level

17   of 16.  There's a number of victims adjustment, which is ten

18   or more, so that increases by two.  Then the offense

19   involved a use of a sophisticated means.  I'm on page 20,

20   which adds another two.

21          You were an organizer, leader, manager or

22   supervisor.  That would increase by two.  If there was abuse

23   of trust, which the agreement stipulates that there was,

24   that's an increase of two.  There's an increase of two for

25   obstruction of justice.  And then here on page 21, that

1    paragraph 4, that's -- what would you call it, Mr. Langner,

2    grouping?

3                MR. LANGNER:  Correct, Your Honor.

4                THE COURT:

5    Q.  So, Mr. Steele, you understand that you got guidelines

6    for Count 1, guidelines for Count 17, and this paragraph 4

7    discusses how those work together?

8    A.  Yes, Your Honor.

9    Q.  And with respect to numbers, those are all numbers going

10   up.  Now, we've got numbers coming down, and that would be

11   acceptance of responsibility as set forth there in

12   paragraph 5.  Your criminal history will be whatever it is.

13   At the moment it looks like you and the government predict

14   that your criminal history score is likely to be a 1.

15         By the time I get the presentence investigation

16   report, I'll know what it actually is, and I mean that's

17   another great example of how the Court is not bound.

18   Sometimes we'll have a plea agreement that says the

19   defendant is a criminal history category 3.  The confusion

20   doesn't usually come when there's a category 1, but it

21   could.

22         But, you know, like defendant pleads guilty,

23   assuming that he's going to be a category 3, well, then the

24   Probation Department finds out he's got a robbery conviction

25   from Louisiana or something and that bumps it up.  So it is

1    whatever it turns out to be.

2           If the adjusted offense level is 30, and the

3    criminal history category is 1, the guideline range is 97 to

4    121 months in prison.  The fine range would be 30,000 to

5    300,000.  The supervised release guideline range would be

6    between two and five years, and you and the government

7    reserve the right to make motions for departures or

8    variances from whatever the applicable guideline is.  Have I

9    got that right?  Are you understanding?

10   A.  Yes, Your Honor, I understand.

11   Q.  Okay.  Special assessments.  You know about the

12   restitution, cooperation, waiver of appeal.

13          I talked about how if you plead guilty you can't

14   ever withdraw your plea.  You can't -- you also can't appeal

15   your guilt to a higher court or any of the legal issues in

16   your case to a higher court, but sentencing is a different

17   matter.  Pursuant to this agreement, you give up your right

18   to appeal your sentence also unless it's longer than five

19   years.  Well, 60 months, that's five years; right?

20   A.  I understand, Your Honor.

21   Q.  And there's an express waiver of the right to petition

22   under 2255 except for a post-conviction attack based on a

23   claim of ineffective assistance of counsel, and that's

24   always in there because that's not waivable so --

25          You've discussed your rights with your attorney,

```
 1    and you want to proceed?

 2    A.  Yes, Your Honor.

 3    Q.  Okay.  Have you signed the plea agreement?

 4    A.  Yes, Your Honor.

 5    Q.  All right.  If it's been fully executed, I'll receive

 6    the document.  And that's your signature John L. Steele?

 7    A.  Yes, Your Honor.

 8    Q.  And it's dated today, which is March 6th.  All right.

 9    Let's find out about you.  How old are you, Mr. Steele?

10    A.  I'm 46, Your Honor.

11    Q.  Okay.  You graduated from high school, yes?

12    A.  Yes, Your Honor.

13    Q.  College?

14    A.  Yes, Your Honor.

15    Q.  What did you major in in college?

16    A.  History.

17    Q.  And then after college?

18    A.  I went to law school, University of Minnesota.

19    Q.  Did you graduate?

20    A.  Yes, Your Honor.

21    Q.  And do you have any other post-college education?

22    A.  No, I took a few classes in graduate school for history.

23    That's all.

24    Q.  I mean not that law school is not enough.  For most

25    people, it's more than enough.
```

```
 1              You speak English, obviously?
 2    A.  Yes, Your Honor.
 3    Q.  We don't have to get an interpreter or anything.  Have
 4    you had enough time to talk with your lawyers, and you're
 5    satisfied that they've done a good job of representing you?
 6    A.  Yes, Your Honor.
 7    Q.  And that if you wanted to go to trial, they'd be willing
 8    to take it to trial.  They're not giving you the bum's rush
 9    to try to make you plead guilty?
10    A.  No, Your Honor.
11    Q.  Has anybody threatened you in any way or put any
12    pressure on you to try to get you to plead guilty?
13    A.  No.
14    Q.  Made you any promises other than what's contained in the
15    plea agreement?
16    A.  No.
17    Q.  Have you had any drugs or alcohol in the last 24 hours?
18    A.  No, Your Honor.
19    Q.  Are you addicted to narcotics?
20    A.  No.
21    Q.  Do you take any medications prescribed by a doctor?
22    A.  No, Your Honor.
23    Q.  Have you recently?
24    A.  No.
25    Q.  Do you see a physician for any ongoing health problems?
```

1   A.  No, Your Honor.

2   Q.  What about a psychiatrist or psychologist?

3   A.  No.

4   Q.  So is there anything in your mind that interferes with

5   your ability to understand what's going on in court and to

6   proceed?

7   A.  No, Your Honor.

8   Q.  All right.  Let me talk to you about the rights that you

9   give up by pleading guilty.  Obviously, you give up your

10  right to go to trial.  And trial would have to take place in

11  the reasonably near future because you have a right to a

12  speedy trial.  There would be a jury, 12 people on the jury,

13  and you and your lawyer would participate in the selection

14  of those jurors.  You understand that, right?

15  A.  Yes, Your Honor.

16  Q.  The jury's verdict would have to be unanimous.  You

17  couldn't be found guilty unless all 12 jurors agreed that

18  you were guilty.  And those jurors, each one of them, has to

19  find you guilty by proof beyond a reasonable doubt, which is

20  more than a civil standard.  It's the highest standard of

21  proof in our system of justice; do you understand that?

22  A.  Yes, Your Honor.

23  Q.  The way the government tries to meet that burden is they

24  call witnesses and present evidence.  That's all done right

25  in open court right in front of you, and you have an

1    opportunity to object to any evidence that they present and

2    also to cross-examine any witnesses that they call against

3    you because you have the constitutional right of

4    confrontation.  You understand that as well, right?

5    A.  Yes, Your Honor.

6    Q.  The jury, of course, presumes you to be not guilty and

7    that presumption of innocence stays with you throughout the

8    trial, and it is reason enough to acquit you unless the

9    government meets that burden that we have to discussed.

10           You have a right to call witnesses and present a

11   case, if you want to.  You don't have to.  If you wish to

12   call witnesses, and they either can't or won't voluntarily

13   come to Court, I would make sure that you got a Court Order

14   compelling them to show up because you've got the right to

15   the subpoena power of the Court.  Do you understand that?

16   A.  Yes, Your Honor.

17   Q.  Regardless of whether you called any other witnesses,

18   you would have the right to testify in your own behalf if

19   you so chose.  You also would not have to.  Even if you

20   called other witnesses or regardless of whether you called

21   other witnesses, you could remain silent at your trial.  And

22   if you did not testify, no one would comment on your silence

23   in the presence of the jury, and the jury wouldn't be

24   permitted to hold it against you in any way.  And in my

25   experience, they take that obligation very seriously.

1    Anyway, you understand you have that right?

2    A.  Yes, Your Honor.

3    Q.  You also have a right to make pretrial motions or also

4    if there's a trial, you could make motions at that time, and

5    that would be your opportunity to challenge the legality or

6    the constitutionality of any actions taken by the government

7    in connection with the investigation of the case against you

8    or the prosecution of you or anything.  If you plead guilty,

9    you give up any of those rights.

10   A.  Yes, Your Honor.

11   Q.  Along with the right, obviously, to appeal any decision

12   that would have been made because if there's no decision,

13   there's nothing to appeal.

14           Any time you are in court, you have a right to be

15   represented by a lawyer.  And if you can't afford a lawyer,

16   one will be appointed to represent you at no cost, but you

17   never have to face the Court or the jury without the

18   assistance of your lawyer.  Do you understand that?

19   A.  Yes, Your Honor.

20   Q.  Now, let me just ask the lawyers, all the lawyers except

21   for you, whether there's anything on the rights that I've

22   missed?

23           MR. LANGNER:  I'm sorry, what was the question,

24   Your Honor?

25           THE COURT:  Anything on the rights?

```
 1              MR. LANGNER:  No, I think you've covered
 2    everything.
 3              THE COURT:  Okay.  Mr. Eiglarsh?
 4              MR. EIGLARSH:  You've covered everything, Your
 5    Honor.
 6              THE COURT:  So the last thing is I need to know
 7    what makes you guilty of this offense.  And I don't know how
 8    they do it in Florida, usually we ask the prosecutor to go
 9    through the factual basis.
10              MR. EIGLARSH:  That's fine.
11              THE COURT:  Mr. Langner?
12    BY MR. LANGNER:
13    Q.  Mr. Steele, I'm going to ask you some questions about
14    some of the facts in this case.  Okay?
15    A.  Yes.
16    Q.  First of all, there's a factual basis in this plea
17    agreement that stretches from right at the beginning, right
18    at the end of page one all the way through page 19, do you
19    see that?
20    A.  Yes.
21    Q.  And you've had an opportunity to review that factual
22    basis, correct?
23    A.  Yes.
24    Q.  You've had plenty of time to look at that, go through it
25    with your attorney?
```

```
 1    A.  Yes.
 2    Q.  And everything in there is true to the best of your
 3    knowledge; is that right?
 4    A.  Yes.
 5    Q.  You may -- some of the facts that are in there, in fact
 6    many of the facts you have direct knowledge of, correct?
 7    A.  That's correct.
 8    Q.  And there are some facts where you weren't the one who
 9    did something, but you knew that it was going on at the
10    time, correct?
11    A.  Yes, that's correct.
12    Q.  And there are some facts that you may not have known
13    about, but you now know that the government has sufficient
14    evidence to prove those things, correct?
15    A.  Yes.
16    Q.  But all of this to the best of your knowledge as you
17    stand here today is true and accurate, correct?
18    A.  Yes.
19    Q.  I'm going to go through some of the -- I'm not going to
20    go through every detail in this factual basis, but I'm going
21    to cover a few of the highlights.
22          First of all, beginning in about September of
23    2010, is it true that you and an individual named Paul
24    Hansmeier began operating a law firm named Steele Hansmeier,
25    PLLC?
```

1    A.  Yes.

2    Q.  And through that law firm, you began representing

3    individuals and entities that owned copyright to

4    pornographic movies, correct?

5    A.  Yes.

6    Q.  And you and certain people that worked for you monitored

7    file sharing websites and obtained IP addresses of

8    individuals who downloaded or attempted to download your

9    clients' movies, correct?

10   A.  Yes.

11   Q.  And then you would file lawsuits against those

12   individuals in an attempt to obtain their identities and

13   then obtain settlements from them, correct?

14   A.  Yes.

15   Q.  And is it true that beginning in about April of 2011,

16   you and Mr. Hansmeier began uploading your clients'

17   pornographic movies to BitTorrent file sharing websites,

18   including a website named the Pirate Bay?

19   A.  Yes.

20   Q.  Now, you weren't the one that actually did the uploading

21   in this case, correct?

22   A.  No.

23   Q.  But you knew that it was going on at least not too long

24   after it began, correct?

25   A.  Yes.

```
 1    Q.  And you did this without obtaining your clients'

 2    consent, and you did it in order to entice people to

 3    download the movies so that you could catch them and then

 4    threaten to sue them, correct?

 5    A.  Yes.

 6              THE COURT:  Hold on a second.  What clients'

 7    consents?

 8              MR. LANGNER:  Without the clients that own the

 9    copyright to the movies.

10              THE COURT:  Oh, I thought you said "your clients."

11              MR. LANGNER:  Yeah, their clients.  They

12    represented individuals who own the copyrights to

13    pornographic movies, and they would upload those movies onto

14    file sharing websites without asking the clients whether

15    they can do it or not.

16              THE COURT:  Okay, thank you.

17    BY MR. LANGNER:

18    Q.  And you knew those bit torn websites where you were

19    uploading the movies were specifically designed to aid

20    copyright infringement by allowing people to share files

21    including movies, correct?

22    A.  Yes.

23    Q.  And by doing that, you knowingly caused your clients'

24    movies to be shared and distributed on those websites and

25    thereby purposely allowed and authorized the BitTorrent
```

1   users to obtain your clients' movies, correct?

2   A.  Yes.

3   Q.  Afterwards or after doing that, you and Mr. Hansmeier

4   caused lawsuits to be filed throughout the country

5   disingenuously alleging that individuals who purportedly

6   downloaded the movies did so without authorization or

7   consent from the copyright holders, correct?

8   A.  Yes.

9   Q.  And as an example, two of the movies that you uploaded

10  you obtained from a client, and their names were "Sexual

11  Obsession" and "Popular Demand," correct?

12  A.  Yes.

13  Q.  And those two movies in particular you filed

14  approximately 200 fraudulent copyright infringement lawsuits

15  throughout the country seeking subscriber information

16  associated with more than 3,000 IP addresses based on the

17  allegation that people had downloaded those movies, when in

18  fact you were the ones who had actually uploaded those onto

19  the website, correct?

20  A.  Yes.

21  Q.  After filing each of these lawsuits, you filed or caused

22  to be filed ex parte motions for early discovery that failed

23  to disclose your involvement in uploading the copyrighted

24  movies, correct?

25  A.  Yes.

1    Q.  And courts throughout the country were relying on those

2    false and misleading representations, gave you early

3    discovery, and thereby authorized you to subpoena internet

4    service providers to get the subscriber information

5    associated with those IP addresses, correct?

6    A.  Yes.

7    Q.  After obtaining the subscriber information, you or

8    Mr. Hansmeier or people employed by you would call people

9    and attempt to extract settlements from them, correct?

10   A.  Yes.

11   Q.  And you never informed those people that you in fact

12   were the ones who had uploaded those movies onto the

13   websites, correct?

14   A.  No, that's correct.

15   Q.  And by lying to courts and misleading courts in order to

16   obtain that subscriber information and then deceiving the

17   subscribers, you obtained a number of settlements over the

18   years from these people, correct?

19   A.  Yes.

20   Q.  And those settlements were generally in the range of a

21   few thousand dollars; although, they varied depending on

22   people's circumstances, correct?

23   A.  Correct.

24   Q.  And is it true that in or about November of 2011, at

25   least in part in order to distance yourselves from these

1   copyright infringement lawsuits that you were filing, you

2   caused Prenda Law to be created?

3   A.  Yes.

4   Q.  And there was an attorney in Chicago whose initials are

5   P.D. that was at least nominally the owner of that law firm,

6   correct?

7   A.  Yes, it was.

8   Q.  And at least at times, you exerted de facto control over

9   that law firm including the primary direction of its

10   employees and the dispensation of its finances, correct?

11   A.  Yes.

12   Q.  And despite controlling Prenda Law, and at various times

13   filing appearances for or in connection with Prenda Law, you

14   and Mr. Hansmeier on multiple occasions falsely denied to

15   various courts any direct involvement or control over that

16   law firm, correct?

17   A.  Yes, that's correct.

18   Q.  Is it also true that beginning in or about 2011, you

19   created or employed various sham entities including AF

20   Holdings, Ingenuity 13, Guava, LLC, and Livewire Holdings,

21   and LW Systems, in order to shield what was going on?

22   A.  Yes, that's correct.

23   Q.  AF Holdings, in particular, you used to house the two

24   movies that I mentioned earlier, "Sexual Obsession" and

25   "Popular Demand," correct?

Case 1:13-cv-01569-Document 143-1 Filed 14/13/18 Page 24 of 32 PageID #:2189 24

```
1    A.  Yes.

2    Q.  And each of these entities, you at times would get other

3    people to sign on behalf of that entity, including two

4    individuals, one named M.L., and another named A.C., in

5    order to shield your ownership or control over those

6    entities?

7    A.  Yes.

8    Q.  I'm going to skip ahead now to the next section.

9             Is it true that beginning no later than in or

10   about May of 2012, you and Mr. Hansmeier filmed and caused

11   to be filmed pornographic movies in order to further your

12   scheme?

13   A.  Yes.

14   Q.  On at least three occasions in Chicago, Miami, and Las

15   Vegas, you and Mr. Hansmeier at times assisted by other

16   people who were working with you contracted with adult film

17   actresses and produced multiple short pornographic films?

18   A.  Yes.

19   Q.  Afterwards, you and Mr. Hansmeier caused a company that

20   you owned, Ingenuity 13, to obtain copyrights to those

21   movies?

22   A.  Yes, that's correct.

23   Q.  Those movies bore names such as "Five Fan Favorites" and

24   "A Peek Behind The Scenes of The Show," among others?

25   A.  Yes.
```

1    Q.  And you and Mr. Hansmeier made no legitimate effort to

2    publicly distribute or commercially release these movies,

3    instead you instructed an individual that worked for

4    Mr. Hansmeier to upload those movies onto file sharing

5    websites, so that you could catch and then later threaten to

6    sue people who attempted to download them?

7    A.  Yes.

8    Q.  And when you did catch people that downloaded those

9    movies, you caused fraudulent and misleading lawsuits to be

10   filed throughout the country, which alleged that they had

11   downloaded these movies without the copyright owner's

12   consent, correct?

13   A.  Yes.

14   Q.  And is it also true that beginning in or about October

15   of 2012, after courts had begun limiting the discovery that

16   you could obtain, that you and Mr. Hansmeier caused lawsuits

17   to be filed generally on behalf of the company Guava LLC,

18   that falsely alleged that your clients' computer systems had

19   been hacked, correct?

20   A.  Yes.

21   Q.  And essentially there was no hacking, nobody broke into

22   their computer systems, and those lawsuits were based

23   largely or if not entirely on lies, correct?

24   A.  Yes, that's my understanding, yes.

25   Q.  You weren't the one who was specifically making those

1  allegations, but you knew that that was going on, correct?

2  A.  Yes.

3  Q.  In fact, to your knowledge, Guava had no computer

4  systems.  It was a sham entity that you had created in order

5  to further the scheme, correct?

6  A.  Yes, yes.

7  Q.  And in order to make those lawsuits go smoothly, you and

8  Mr. Hansmeier also recruited one or more individuals to be

9  ruse defendants, and these were individuals who had been

10  caught downloading one of your movies from a file sharing

11  website who had agreed that in exchange for you not charging

12  them with a settlement payment, they would be sued and allow

13  discovery to proceed, correct?

14  A.  Yes.

15  Q.  But as you and Mr. Hansmeier knew, these people had not

16  participated in any hacking activity.  They had simply

17  downloaded one of the movies that you controlled, correct?

18  A.  Yes.

19  Q.  Is it true that in or about early 2013, courts began

20  scrutinizing your litigation tactics?

21  A.  Yes.

22  Q.  And upon recovering certain of the facts that we've gone

23  through today, courts began denying your request to subpoena

24  internet service providers and dismissing your lawsuits?

25  A.  Yes.

1    Q.  They also began accusing you of engaging in deceptive

2    and fraudulent behavior, correct?

3    A.  Yes.

4    Q.  In particular, Judge Wright from the District Court in

5    the Central District of California, issued an order in May

6    of 2013 that imposed sanctions against you, correct?

7    A.  Yes.

8    Q.  And in order to evade detection and to cover up what you

9    had done from that point even before that and stretching

10   after that, you lied to courts throughout the country, both

11   you directly as well as causing other people to lie in your

12   behalf in order to help cover up what had been done?

13   A.  Yes.

14   Q.  And there's a list of specific instances where somebody

15   either filed a declaration with the Court under oath or

16   testified under oath in a false or misleading manner at your

17   direction or at least with your knowledge, correct?

18   A.  Yes.

19   Q.  And to the best of your knowledge, each of those that

20   are in subparagraphs A through J -- I'm sorry, no, L -- no,

21   I'm sorry, N on page 18 each described one of those

22   instances in a true and accurate way, correct?

23   A.  Yes.

24   Q.  Is it true that in total between 2010 and 2014, you and

25   Mr. Hansmeier and your entities received more than six

1     million dollars in copyright infringement settlement
2     payments?
3     A.  To the best of my understanding, yes.
4     Q.  And you caused losses to individuals based on the
5     conduct we've described totaling at least approximately
6     three million dollars?
7     A.  Yes.
8     Q.  Is it also true that in or about 2012, you created a
9     company named Under The Bridge Consulting that you intended
10    to and did use to collect consulting fees after transferring
11    the operations of Steele Hansmeier PLLC to the individual
12    P.D., who controlled Prenda Law?
13    A.  Yes.
14    Q.  Is it true that you and Mr. Hansmeier thereafter
15    transferred approximately one million dollars of the
16    proceeds of this scheme to Under The Bridge Consulting and
17    distributed those monies to yourselves?
18    A.  Yes.
19    Q.  And did you do that, your use of Under The Bridge
20    Consulting was designed at least in part to conceal or
21    disguise the nature, source, ownership and control of the
22    proceeds of the scheme?
23    A.  Yes.
24            MR. LANGNER:  Your Honor, that's all the questions
25    that I have for Mr. Steele.

```
 1                THE COURT:  Mr. Eiglarsh, do you have any other

 2    questions?

 3                MR. EIGLARSH:  No, he was extremely thorough.

 4                THE COURT:  And, Mr. Steele, anything you want to

 5    clarify in there?

 6                THE DEFENDANT:  No, Your Honor.

 7                THE COURT:  Okay.  Did anyone force you to commit

 8    the crime?

 9                THE DEFENDANT:  No.

10                THE COURT:  And you knew it was against the law

11    when you were doing it?

12                THE DEFENDANT:  Yes.

13                THE COURT:  Did some part of the scheme take place

14    in the State and District of Minnesota?

15                THE DEFENDANT:  Yes.

16                THE COURT:  Is this where you were headquartered

17    or were most of your activities in --

18                THE DEFENDANT:  The activities described here

19    occurred in Minnesota.

20                THE COURT:  Okay.

21                THE DEFENDANT:  I was aware of them.  I mean,

22    obviously, I wasn't here in Minnesota.

23                MR. LANGNER:  Is it true, Mr. Steele, that

24    Mr. Hansmeier had an office here in Minnesota?

25                THE DEFENDANT:  Yes.
```

```
 1              MR. LANGNER:  And he operated, most of the
 2     activities that he did took place in Minnesota here?
 3              THE DEFENDANT:  Yes.
 4              THE COURT:  Okay.  Well, that seems to take care
 5     of the venue question.  Very well.  Then I will formally ask
 6     you how you plead.
 7              First of all, is your full and correct name John
 8     L. Steele, S-T-E-L-E.
 9              THE DEFENDANT:  S-T-E-E-L-E, yes.
10              THE COURT:  S-T-E-E-L-E, thank you.
11              How do you plead to Count 1 of the indictment on
12     file against you charging you with conspiracy to commit mail
13     fraud and wire fraud in violation of Title 18, United States
14     Code Section 1349, guilty or not guilty?
15              THE DEFENDANT:  Guilty, Your Honor.
16              THE COURT:  How do you plead to Count 17 of the
17     indictment on file against you charging you with conspiracy
18     to commit money laundering in violation of Title 18, United
19     States Code Section 1956H, guilty or not guilty?
20              THE DEFENDANT:  Guilty, Your Honor.
21              THE COURT:  All right.  I'm satisfied that you're
22     guilty of the offense and that you know what you're doing
23     here today, so I accept your plea.
24              Now, the Probation Department will prepare a
25     presentence investigation report.  You should cooperate with
```

1     them as they do that.  Also, read through it when it's all

2     done, make sure there aren't any mistakes in it, and then

3     we'll see you back here at the time of sentencing.

4              MR. LANGNER:  Your Honor, if I might, the plea

5     agreement contains a cooperation provision, and we

6     anticipate that Mr. Steele will provide truthful information

7     and truthful testimony against Mr. Hansmeier if called to

8     testify.  We may ask that the PSR or his sentencing be

9     delayed until the resolution of Mr. Hansmeier's case so that

10    we can best judge his cooperation, if that's okay with the

11    Court.

12             THE COURT:  I was about to set Friday, July 7th,

13    as the sentencing date, but I'm not even going to bother

14    doing that under these circumstances.

15             MR. LANGNER:  I would suggest that we can

16    communicate to the Court when it -- obviously, when

17    Mr. Hansmeier, when that case is resolved, then we can start

18    the process, and we can communicate with the Court when

19    we're ready to move forward.

20             THE COURT:  Thank you.  Did you see my mouth open?

21    I was ready to set the sentencing date.  You jumped in just

22    in the nick of time.

23             Let's see here.  What about release?  It looks

24    like you're not in Sherburne.  You're not wearing orange.

25             THE DEFENDANT:  No, Your Honor.

```
 1            THE COURT:  Okay.  No issues with him on release,
 2     have there been?
 3            PROBATION OFFICER:  Nothing additional to the
 4     report that you're reviewing, Your Honor.
 5            THE COURT:  Okay.  And that's the travel order
 6     that I signed on February 27th?
 7            PROBATION OFFICER:  That's correct.
 8            THE COURT:  All right.  Mr. Steele, you will
 9     remain at liberty on the same terms and conditions as you
10     have been up to today's date.
11            THE DEFENDANT:  Thank you, Your Honor.
12            THE COURT:  All right.  Anything else?
13            MR. LANGNER:  No, Your Honor.
14            MR. EIGLARSH:  No, Your Honor.
15            THE COURT:  Thank you very much.  We're in recess.
16                 (Court adjourned at 10:13 a.m.)
17                        *     *     *
18
19        I, Maria V. Weinbeck, certify that the foregoing is
20     a correct transcript from the record of proceedings in the
21     above-entitled matter.
22                 Certified by:  s/ Maria V. Weinbeck
23                                Maria V. Weinbeck, RMR-FCRR
24
25
```